## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| SHIQIANG CHEN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | Case No.: |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| vs. | CLASS ACTION |
| NQ MOBILE INC., VINCENT WENYONG SHI, ROLAND WU, and ZEMIN XU, | **JURY TRIAL DEMANDED** |
| Defendants. | |

TO THE HONORABLE COURT:

Plaintiff Shiqiang Chen ("Plaintiff") individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by NQ Mobile Inc. ("NQ Mobile" or the "Company"), as well as media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased publicly traded

NQ Mobile securities from March 30, 2017 through February 6, 2018, both dates inclusive ("Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.      Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the Company conducts business in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying PSLRA Certification, acquired NQ Mobile securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

7.      Defendant NQ Mobile provides internet services in the People's Republic of China ("PRC") and internationally. The Company is incorporated in the Cayman Islands with its

principle executive offices located in Beijing, PRC. NQ Mobile securities trade on New York Stock Exchange ("NYSE") under the symbol "NQ."

8.      Defendant Vincent Wenyong Shi ("Shi") has been the Company's Chairman since December 2014 and Chief Operating Officer since October 2005.

9.      Defendant Roland Wu ("Wu") has been the Company's Chief Financial Officer since June 2015.

10.     Defendant Zemin Xu ("Xu") has been the Company's Chief Executive Officer since December 2014 and President since December 2010.

11.     Defendants Shi, Wu, and Xu are herein referred to as "Individual Defendants."

12.     Collectively, Defendant NQ Mobile and Individual Defendants are herein referred to as "Defendants."

13.     Each of the Individual Defendants:

    a.      directly participated in the management of the Company;

    b.      was directly involved in the day-to-day operations of the Company at the highest levels;

    c.      was privy to confidential proprietary information concerning the Company and its business and operations;

    d.      was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    e.      was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.     was aware of or recklessly disregarded the fact that the false and

misleading statements were being issued concerning the Company; and/or

g.     approved or ratified these statements in violation of the federal securities

laws.

14.     NQ Mobile is liable for the acts of the Individual Defendants and its employees

under the doctrine of *respondeat superior* and common law principles of agency as all of the

wrongful acts complained of herein were carried out within the scope of their employment with

authorization.

15.     The scienter of the Individual Defendants and other employees and agents of the

Company is similarly imputed to NQ Mobile under *respondeat superior* and agency principles.

## SUBSTANTIVE ALLEGATIONS

### Defendants' False and Misleading Class Period Statements

16.     On March 30, 2017, NQ Mobile issued the press release "NQ Mobile Inc. Enters

into Definitive Agreements to complete the FL Mobile Divestment and for the Sale of

Showself's Live Social Video Business." The press release stated in relevant part:

BEIJING, March 30, 2017 /PRNewswire/ -- NQ Mobile Inc. ("**NQ Mobile**" or the "**Company**"), a leading global provider of mobile Internet services, today announced that the Company had entered into definitive agreements (the "**Agreements**") with Tongfang Investment Fund Series SPC (the "**Investor**"), an affiliate of Tsinghua Tongfang. Pursuant to the terms of the Agreements, the Investor will acquire (i) 63% equity interests in FL Mobile Jiutian Technology Co., Ltd. ("**FL Mobile**"), being all of the equity interests beneficially owned by the Company, for a cash consideration of RMB2,520 million, valuing the entire FL Mobile business at RMB4 billion and (ii) 65% equity interests in Beijing Showself Technology Co., Ltd ("**Beijing Showself**"), a live social video business, being all of the equity interests beneficially owned by the Company, for a cash consideration of RMB800 million, valuing the entire Beijing Showself live social video business at RMB1,230 million (together, the "**Transactions**").

The Investor will pay RMB150 million in cash as the non-refundable earnest money which will be counted towards the payment of the purchase price. The Investor will pay the remaining amount of the total consideration on or

before May 31, 2017 after the Company delivers all of its equity interests in FL Mobile and Beijing Showself.

In addition to purchasing FL Mobile and Beijing Showself, within three months after the date of the full payment of the purchase price for the 63% equity interests in FL Mobile, the Investor has an option to subscribe for US$100 million value of class A common shares of the Company at the price of US$1.05 per share, or US$5.25 per ADS.  The Company also announced that, the proposed investment of US$101 million from management as announced in a press release on March 29, 2016 is now expected to take place within 3 months following the consummation of the sale of FL Mobile under the Transactions.

***Dr. Vincent Wenyong Shi, the chairman and chief operating officer of the Company, has equity interest in FL Mobile and will continue to participate with the Investor in the future.*** The Transactions and the execution of the Agreements have been approved by the board of directors of the Company and its audit committee. The consummation of the Transactions are subject to customary closing conditions.

(Emphasis added).

17.    On April 26, 2017, NQ Mobile filed an annual report on Form 20-F for the fiscal year ended December 31, 2016 (the "2016 20-F") with the SEC, which provided the Company's annual financial results and position. The 2016 20-F was signed by Defendant Shi. The 2016 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Wu and Xu attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

18.    The 2016 20-F stated the following regarding related party transactions and NQ Mobile's transaction with Tongfang Investment Fund Series SPC ("Tongfang")'s acquisition of interests in FL Mobile and Beijing Showself (the "Transaction"), in relevant part:

***Further, in late March 2016, Dr. Vincent Wenyong Shi, our chairman of the board and chief operating officer as well as the chairman of FL Mobile, entered into a termination and share purchase agreement with FL Mobile and Xinjiang NQ, pursuant to which, Dr. Shi acquired 22% equity interest in FL Mobile by terminating the relevant contractual arrangements and paying Xinjiang NQ a total consideration of RMB880 million.*** The transaction with Dr. Shi contains provisions to allow Dr. Shi or us to revert the transfer in certain circumstances, including: (i) in the event that the A-share listing is cancelled or fails to receive

necessary governmental approvals, both NQ and Dr. Shi may revert the transaction; (ii) Dr. Shi and FL Mobile shall endeavor to complete the A-share listing within two years after the date of this agreement. In the event such A-share listing is not completed within such two-year period, we may revert the transaction; and (iii) No party may revert the transaction after the A-share listing is approved by relevant government authorities. In November 2016, we and Dr. Shi cancelled the plan for A-share listing because it was reasonably determined that the A-share listing was unlikely to happen due to difficulties in obtaining regulatory approvals, and therefore agreed to revert part of this transaction. As a result, and the equity interests in FL Mobile purchased by Dr. Shi under this termination and share purchase agreement was changed to 16.34% and the consideration was adjusted proportionately to RMB653.6 million

*        *        *

*As part of FL Mobile Divestment, (i) the Group sold 22% of equity interests in FL Mobile to Dr. Vincent Wenyong Shi, the Company's chairman and chief operating officer, for a consideration of RMB880 million (US$127million) via a termination and share purchase agreement in March 2016, however, 5.66% of the equity interests transferred was reverted in November 2016, as both the Company and Dr. Vincent Wenyong Shi have the right to revert the transaction entirely, such consideration was recorded as consideration received from shareholder on the balance sheet as of December 31, 2016,* (ii) the Group sold 12% of equity interests in FL Mobile to Xinjiang Yinghe Equity Investment Management Limited Partnership ("Xinjiang Yinghe"), an affiliate of the management of FL Mobile, however, such transaction was terminated and reverted in November 2016, (iii) the Group sold a total of 20.66% of equity interests in FL Mobile to several affiliates of Beijing Jinxin in May 2016 and August 2016.

In March 2017, the Group entered into definitive agreements (the "Agreements") with Tongfang Investment Fund Series SPC (the "Investor"), affiliate private equity investment fund of Tsinghua Tongfang. Pursuant to the terms of the Agreements, the Investor will acquire (i) 63% equity interests in FL Mobile, being all of the equity interests beneficially owned by the Company, for a cash consideration of RMB2,520 million and (ii) 65% equity interests in Showself (Beijing) Technology Co., Ltd ("Showself (Beijing)"), a live social video business, being all of the equity interests beneficially owned by the Company, for a cash consideration of RMB 800 million. The Investor had paid RMB150 million in cash as the non-refundable earnest money which will be counted towards the payment of the purchase price. The Investor will pay the remaining amount of the total consideration on or before May 31, 2017 after the Company delivers all of its equity interests in FL Mobile and Showself (Beijing). The consummation of the Transactions is subject to customary closing conditions (see Note 24(b)).

*The Company has transferred their equity interests in FL Mobile and Showself (Beijing) to these purchasers pursuant to their contracts with them, and are in the process to collect remaining purchase price and close the whole FL Mobile*

***and Showself (Beijing) Divestment***. In addition to purchasing FL Mobile and Showself (Beijing), the affiliate private equity fund of Tsinghua Tongfang also has the option to purchase US$100 million worth of Class A Common shares of the Company at a price of US$1.05 per share, or US$5.25 per ADS within 3 months after the date of the full payment pursuant to the agreements to purchase FL Mobile.

 (Emphasis added).

19.     On May 31, 2017, NQ Mobile provided an update on the Transaction by issuing

the press release entitled "NQ Mobile Inc. Provides An Update on the Divestment of FL Mobile

and Showself Businesses" which stated in relevant part:

BEIJING, May 31, 2017 /PRNewswire/ -- NQ Mobile Inc. (NYSE: NQ) ("NQ Mobile" or "the Company"), a leading global provider of mobile Internet services, today provided an update on the FL Mobile Divestment. The Company was notified by Tongfang Investment Fund Series SPC (the "Purchaser") that additional time is needed for making the payment of the remaining purchase price for the sale of FL Mobile Jiutian Technology Co., Ltd. and Beijing Showself Technology Co., Ltd (the "Transactions"). The Purchaser has further communicated its confidence to the Company and is making final preparations for completing the Transactions. The Company will continue to work with the Purchaser to close the Transactions as soon as possible.

20.     On August 31, 2017, NQ Mobile provided an updated on the Transaction on its

blog located at: http://blog.nq.com/nq-mobile-update-3/, stating in relevant part:

Since our latest press release on May 31, 2017 about the information that Tongfang Investment Fund Series SPC (the "Purchaser") needs additional time to complete the transaction to acquire FL Mobile Jiutian Technology Co., Ltd. and Beijing Showself Technology Co., Ltd., ("the Transaction") we have received some queries from our investors about the status of the Transaction. We are working closely with the Purchaser, and doing our best to move the Transaction forward. Currently, the Purchaser still needs additional time to complete the Transaction. However, both the Purchaser and us are confident that this Transaction will be completed soon. In addition, we expect to announce our financial results for the first half of 2017 shortly after the completion of the Transaction.

21.     On November 9, 2017, NQ Mobile provided an update on the Transaction by

issuing the press release entitled "NQ Mobile Inc. Provides an Update on the FL Mobile

Divestment and the Sale of Showself's Live Social Video Business" which stated in relevant

part:

> BEIJING, Nov. 9, 2017 /PRNewswire/ -- NQ Mobile Inc. ("**NQ Mobile**" or the
> "**Company**"), a leading global provider of mobile internet services, today
> provided an update on the FL Mobile Divestment and the sale of Showself's live
> social video business. The Company today received an additional RMB800
> million cash which is in addition to the RMB150 million cash received at the time
> of the signing of the definitive agreements on March 30, 2017. This brings the
> total cash received by the Company pursuant to the definitive agreements of the
> divestments to RMB950 million. Tongfang Investment Fund Series SPC (the
> "**Investor**"), an affiliate of Tongfang Securities Limited, a part of Tsinghua
> Tongfang, remains committed to completing the entire divestments consisting of
> acquiring i) 63% equity interests in FL Mobile Jiutian Technology Co., Ltd. ("**FL
> Mobile**"), being all of the equity interests beneficially owned by the Company,
> for a cash consideration of RMB2,520 million, valuing the entire FL Mobile
> business at RMB4 billion and (ii) 65% equity interests in Beijing Showself
> Technology Co., Ltd ("**Beijing Showself**"), a live social video business, being all
> of the equity interests beneficially owned by the Company, for a cash
> consideration of RMB800 million, valuing the entire Beijing Showself live social
> video business at RMB1,230 million.
>
> The Investor is making final preparations for completing these divestments and
> the Company is working with the Investor to ensure this occurs as soon as
> possible. All parties involved remain confident this will complete quickly

22.     On November 20, 2017, NQ Mobile provided an update on the Transaction by

issuing the press release entitled "NQ Mobile Inc. Provides an Update on the FL Mobile

Divestment and the Sale of Showself's Live Social Video Business" which stated in relevant

part:

> BEIJING, Nov. 20, 2017 /PRNewswire/ -- NQ Mobile Inc. ("NQ Mobile" or the
> "Company"), a leading global provider of mobile internet services, today
> provided an update on the FL Mobile Divestment and the sale of Showself's live
> social video business. The Company today received an additional RMB400
> million cash which brings the total cash received by the Company pursuant to the
> definitive agreements of the divestments to RMB1.350 billion. Tongfang
> Investment Fund Series SPC, an affiliate of Tongfang Securities Limited, a part
> of Tsinghua Tongfang, remains committed to completing the entire divestments,
> and all parties involved remain confident this will complete quickly.

23.     On December 14, 2017, NQ Mobile announced the completion of the Transaction

by issuing the press release entitled "NQ Mobile Inc. Completes the FL Mobile Divestment and

the Sale of Showself's Live Social Video Business" which stated in relevant part:

> BEIJING, December 14, 2017 — NQ Mobile Inc. ("NQ Mobile" or the "Company"), a leading global provider of mobile internet services, today announced that it has completed the FL Mobile Divestment and the Sale of Showself's Live Social Video Business. The Company today received additional approximately RMB1.97 billion of consideration for the transaction, consisting of approximately RMB200 million, in cash and RMB1,770 million in a senior note from Tongfang Investment Fund Series SPC (the "Investor"), an affiliate of Tongfang Securities Limited, a part of Tsinghua Tongfang. This brings the total consideration received to approximately RMB3.32 billion, or 100% of the agreed upon price pursuant to the definitive agreements between the Company and the Investor in March 2017. As compensation to the Company, the senior note issued to the Company bears an interest of 8% per annum. This one-year senior note may be extended by another 12 months at the Company's option, and can be redeemed early by the Investor for principle plus accrued interest to the Company at any time.

24.     The statements referenced in ¶¶ 16-23 above were materially false and/or misleading because they misinterpreted and failed to disclose the following adverse facts pertaining to the Company's business and operations which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) NQ Mobile failed to disclose related party transactions involving the Transaction between NQ Mobile and Tongfang; (2) due to the related parties involved in the Transaction, NQ Mobile agreed to consideration in the form of a note with a high likelihood of default; (3) Defendant Shi's interest in the Transaction was not fully disclosed; and (4) as a result, Defendants' statements about NQ Mobile's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Emerges

25.     On February 6, 2018, the report entitled "NQ Mobile: Undisclosed Transfer Of Subsidiaries To Chairman Introduces Significant Risks - Price Target $0" written by Rota Fortunae was published on *SeekingAlpha.com.* The report revealed the undisclosed related party

transactions involved with the Transaction between NQ Mobile and Tongfang, stating in relevant

part:

> Records filed with the Beijing Enterprise Credit Information Network (BECIN) show that on March 31st, 2017, one day after the deal was announced, NQ transferred its interests in both FL Mobile and Showself to Wenyong Shi. We found no disclosure that Wenyong Shi would become an equity owner in Showself, let alone the recipient of NQ's entire equity interest. In fact, the purchase agreement states a portion of the interest to be transferred to Tongfang was to come from Wenyong Shi's share.
>
> ***Our research leads us to believe that Tongfang is controlled by NQ insiders and therefore NQ sold FL Mobile and Showself to insiders.***
>
> An undisclosed sale to insiders would be highly concerning given that NQ failed three times to sell FL Mobile and ended up accepting a $270 million note after Tongfang delayed payment several times. The note represents 90% of NQ's market cap and the remaining business loses $50 million pre-tax per year.
>
> *       *       *
>
> **As noted above, Wenyong Shi's interest in FL Mobile had already been disclosed, so this was not news.** ***However, the press release did not state that Wenyong Shi would acquire an interest in Showself nor did it disclose that NQ would transfer its shares in both companies to Wenyong Shi instead of Tongfang.***
>
> But, BECIN records show that on the very next day, NQ and Xinjiang Yinghe transferred their respected interests in FL Mobile and Showself to Wenyong Shi.
>
> *       *       *
>
> ***According to*** *Section 2.3B* ***of the FL Mobile agreement, NQ was to transfer its 63% aggregate interest to Tongfang.*** Furthermore, **Section 4.3** states that part of NQ's 63% interest in FL Mobile included a 5.66% equity interest held by Wenyong Shi that NQ had the power to direct its disposition. So, per the agreement, Wenyong Shi's 22% interest should have been reduced. Instead it increased to 79.34%.
>
> *Section 7.5* ***states that the obligation of Tongfang to pay the last installment of the purchase price was subject to the satisfaction or waiver by Tongfang of NQ completing the registration evidencing Tongfang as the record owner of 63% equity interest.*** Not only was Tongfang never recorded as the owner, but Wenyong Shi was recorded as the owner nearly eight months before the final payment was made in December 2017.

**The only way we see that NQ did not default on this agreement is if Tongfang waived its rights to the share transfer, which we find it hard to believe an independent thirty party would do.** *Put another way, what are the chances an unrelated party would pay hundreds of millions of dollars to acquire a business only to agree to transfer ownership to the seller's chairman?*

We see two potential explanations for the share transfers to Wenyong Shi. Either Tongfang never acquired the businesses or, more likely, Tongfang acquired them thru a VIE. Like NQ, Tongfang is domiciled in the Cayman Islands and is legally prohibited from directly owning certain Chinese companies. Therefore, FL Mobile and Showself would need to be held by a Chinese entity or individual, such as Wenyong Shi. Further evidence that Tongfang used a VIE is **Section 5.5 – Holding Entities for Future VIE Structure** in which NQ would transfer a VIE subsidiary to Tongfang for $1.

We note that there is nothing wrong with Wenyong Shi having a majority interest in a Tongfang VIE, but if the transaction was not meant to obfuscate the extent of his involvement why were the share transfers not disclosed to shareholders? All this leads us to ask, who controls Tongfang?

### *Who Controls Tongfang Investment Fund?*

In the March 30th, 2017 press release, NQ stated Tongfang Investment Fund is an affiliate of Tsinghua Tongfang. Later press releases changed the language to say Tongfang Investment Fund is an affiliate of Tongfang Securities Limited, a part of Tsinghua Tongfang. Tongfang Securities is wholly-owned by Neo-Neon, a publicly traded company in Hong Kong, which in turn is 64% owned by Tsinghua Tongfang (pg. 15).

According to Rule 405 of the Securities Act (pg. 54), an Affiliate is defined as:

*A person that directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with, the issuer.*

The definition would suggest that Tongfang Securities/Neo-Neon has a control relationship with Tongfang Investment Fund. But Neo-Neon's publicly available financials do not report an interest in or a relationship with Tongfang Investment Fund. As of June 30th, 2017, Neo-Neon reported a book value of $230 million. We would think if a wholly-owned subsidiary of Neo-Neon purchased a company for $500 million, it would be considered material and thus reported.

Furthermore, it does not appear that Tongfang Securities has the financial capability to support a $500 million deal. As of June 30th, Neo-Neon only had $87 million in cash (pg. 27). And if Tongfang Securities funded the deal, Neo-Neon's financials should show approximately $23 million in investing cash outflow for the March 2017 earnest money payment to NQ (as reported in the March 30th, 2017 press release). But the only sizeable outflow was for the

purchase of an available-for-sale investment (pg. 31), which Note 9 states was an investment into a Hong Kong based bond fund. There was also a $728 thousand cash outflow "arising from investing activities" which had no corresponding note.

***We think this is strong evidence that Tongfang Securities (and therefore Neo-Neon and Tsinghua Tongfang) do not control Tongfang Investment Fund and did not invest in FL Mobile and Showself. Our opinion is further supported by the fact that Wenyong Shi remains the legal representative of FL Mobile (as seen in the BECIN records above).***

Every business in China is required to have a legal representative. He/she is the main principal of the company and is the employee with the legal power to represent and enter into binding obligations on behalf of the company. According to the linked article above, PRC Company Law states the legal representative may be one of three people: 1) the chairman of the board; 2) the executive director (if there is not board of directors); or 3) the general manager.

***If Tongfang were an independent party, we would expect to see and independent legal representative. We believe this is strong evidence that Wenyong Shi is the controlling member of Tongfang. But perhaps the best supporting evidence is the fact that NQ announced it would sell FL Mobile to Wenyong Shi three months before the Tongfang deal was announced, but changed the deal after an SEC inquiry.***

### Wenyong Shi To Acquire FL Mobile

On January 23rd, 2017, just months after failing to sell FL Mobile for a third time, NQ announced it entered into a non-binding letter of intent to sell FL Mobile and part of Showself to Wenyong Shi and an unnamed private equity investment fund (the "Investor Group"). We think the failure to disclose the other party is highly suspect. In all the announced attempts to sell FL Mobile, NQ always disclosed who the buyers were.

Apparently, the SEC was also curious. On February 14th, 2017, an SEC comment letter (question #5) requested 1) the name of the private equity fund; 2) the individuals associated with the fund; and 3) if the fund or any of the individuals have a relationship with the company.

On March 1st, 2017, NQ responded to the SEC stating that:

[NQ] is currently in confidential negotiations with the investor group… to the best knowledge of the company after due inquiry, the private investment fund in the investor group is not an affiliate of [NQ].

**We note that NQ's response only said the fund was not an affiliate of NQ (and apparently, this took some inquiry which suggests there was some legitimate question). NQ did not say the individuals associated with the fund**

were not affiliates of NQ. The company also failed to provide the names of the individuals associated with the fund.

*We think this is an important distinction because just three weeks after NQ refused to provide the name of the fund Tongfang was incorporated in the Cayman Islands and six days later NQ announced the deal with Tongfang (with no mention of Wenyong Shi as a buyer). The next day, NQ transferred the shares in FL Mobile and Showself to Wenyong Shi.*

*We also note that the address listed in Tongfang's corporate record is the same as NQ's Cayman address.* But for reasons unknown to us, Tongfang was dissolved in July 2017 and reincorporated using another address on August 30th, 2017, one day before it delayed payment to NQ for a second time (discussed below).

| | |
|---|---|
| **Entity Name :** | Tongfang Investment Fund Series SPC |
| **Jurisdiction :** | Cayman Islands |
| **Registration Number :** | 295511 |
| **Registration Date :** | 24th March 2017 |
| **Entity Type :** | EXEMPT |
| **Registered Office :** | MAPLES CORPORATE SERVICES LIMITED |
| | P. O. Box 309 |
| | Ugland House, |
| | South Church Street, |
| | George Town, |
| | Grand Cayman KY1-1104 |
| | Cayman Islands |

District, Beijing, 100013, the People's Republic of China. Our telephone number at this address is +86 (10) 8565-5555. Our registered office in the Cayman Islands is located at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman KY1-1104, Cayman Islands. Our agent for service of process in the United States is Law Debenture Corporate Services

*Source: Cayman Island General Registry & NQ 20-F*

Investors should come to their own conclusions, but in our opinion the aforementioned facts suggest that Tongfang is controlled by insiders and therefore NQ sold FL Mobile and Showself to insiders. An undisclosed sale to insiders would be highly concerning given that over half the purchase price was paid in a note receivable.

### The Note Receivable

According to the March 30th, 2017 press release, Tongfang put up $23 million of the $507 million as earnest money and agreed to pay the balance on or before May 31st, 2017. But Tongfang delayed payment multiple times ( May 31st press release, August 31st blog update).

Then, on November 9th and November 20th NQ claimed it received a total of $184 million, which combined with the earnest money was still $300 million shy of the purchase price. Finally, on December 14th, nearly seven months after the original deadline (and eight months after the transfer to Wenyong Shi), NQ announced it received an additional $30M and agreed to accept the remaining balance in a $270 million note.

Even if Tongfang were an affiliate of Berkshire Hathaway, its payment history would give us pause. But given that NQ failed to sell FL Mobile three times and our concerns related to the share transfer, *we believe the note carries a high risk of default. A default on the note would not be an insignificant event. $270 million is 90% of NQ's market cap.*

**Equally concerning is NQ's ability to extend maturity. The note has a term of one year, but can be extended for an additional year at NQ's discretion. So if we are correct,** *insiders could push off payment to nearly three years after the share transfers occurred!* **Based on the <u>third quarter financials</u>, FL Mobile and Showself earn $40 million pre-tax per year. Three years of delayed payment would provide $120 million in pre-tax profits before shareholders receive their money. Meanwhile the remaining business is losing $50 million pre-tax per year.**

(Emphasis added.)

26.     On this news, shares of NQ Mobile fell $1.30 per share or over 44.3% to close at $1.68 per share on February 6, 2018, damaging investors.

27.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## <u>PLAINTIFF'S CLASS ACTION ALLEGATIONS</u>

28.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of NQ Mobile during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant

times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

29.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)    whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)    whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)    whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

33.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

34.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NYSE, and was covered by multiple analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

35.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

36.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

37.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

38.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

39.     During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

40.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

41.     The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or

acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

42.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

43.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

44.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the

Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

45.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

46.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

47.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

48.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

49.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

50.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class

Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

51.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

52.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: February 10, 2018    Respectfully submitted,

**STECKLER GRESHAM COCHRAN PLLC**

*/s/ Dean Gresham*
Dean Gresham
Texas Bar No. 24027215
Bruce W. Steckler
Texas Bar No. 00785039
L. Kirstine Rogers
Texas Bar No. 24033009
12720 Hillcrest Rd., Suite 1045
Dallas, Texas 75230
Telephone: (972) 387-4040
Facsimile: (972) 387-4041
Email: dean@stecklerlaw.com
       bruce@stecklerlaw.com
       krogers@stecklerlaw.com

-AND-

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (to be admitted *PHV*)
Phillip Kim, Esq. (to be admitted *PHV*)
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
      pkim@rosenlegal.com

Counsel for Plaintiff